16-5117 Navajo Nation, a federally recognized Indian tribe, Navajo Nation Department of Justice Appellant v. United States Department of the Interior and Sally Jewell. In her official capacity as Secretary of the United States Department of the Interior, Mr. Gordon for the Appellant, Mr. Capel for the Appellant. Good morning. Good morning, Your Honors. May it please the Court. The District Court erred in ruling that the Navajo Nation was barred by equitable estoppel in pursuing its claims under the Indian Self-Determination Act. The silence of the Navajo Nation did not constitute inequitable conduct, and the BIA did not rely on that silence in any event. The BIA's failure to comply with the mandates of the Indian Self-Determination Act is attributable solely to the agency and not to the Navajo Nation. We have set forth in the brief the reasons why the doctrine of equitable estoppel does not apply. The first point is that the Navajo Nation as a sovereign is not to be estopped on the basis of a private party and could be estopped, if at all, only on the basis of affirmative misconduct. This Court has ruled that silence does not constitute affirmative misconduct. Beyond that, even if the Navajo Nation were considered a private party, none of the elements for equitable estoppel are established here. Just thinking about the case more broadly, there are different buckets here, equitable estoppel, the language of the statute, equitable tolling. What if an elapse in appropriations was longer than 90 days? Well, the first thing I would say, Your Honor, is that that is not this case. This case involves an elapse that caused a loss of 13 out of the 90 days at the start of the period. Right. So what's the answer, though, in the question when it's more than 90 days? If it's more than 90 days, well, again, it would depend, I think. Our position is, first and foremost, that elapse in appropriations is not the act of a third party. It is a self-created problem by the government. So the government loses if the lapse is more than 90 days? If it doesn't make provision for it, Your Honor. The government makes provision for essential services and for things that can't lapse. And indeed, the government makes provisions. The reason that Mr. Slim could accept the proposal here was that Mr. Slim, another self-determination specialist, was on a multi-year funding appropriation. What if he was unauthorized to accept it, which it appears he might have been? Well, Your Honor, there's no argument that he was unauthorized to accept it. This is really not a case about receipt. This is a case about the government extending unilaterally. Well, it can be a case about receipt. I understand the government to argue in alternatives that you're stopped if the – you're stopped from arguing the date of receipt against it. They're saying they did not receive the document at the time that the gentleman who was working during the government's stoppage received it. They're saying they didn't receive it until a later date, and the jurist stopped from asserting. So it is about receipt, isn't it? Well, I don't think so, Your Honor. I don't think that that situation is any different. Suppose you had a shutdown, and in the old days before electronic filing, you've got a pleading to file on a civil case. You go down to the clerk's office, and you know that there's a partial shutdown. But the clerk's office is open, and there's a clerk there. Now, it turns out that only criminal clerks are working, and civil clerks aren't working. But you go in, and you hand your pleading to the criminal clerk who accepts it, doesn't say, I'm not authorized to accept it. We would say that that's been received. Yeah. So you would say it's about receipt, but you win. It isn't accurate to say it's not about receipt. Well, Your Honor, there is – there are arguments. The government will argue alternatively, I think, that if you win on the stop of the argument, nonetheless, they won't prevail on the date, because they may not receive until the director of the BIA or the clerk's office is authorized to receive it. But their argument depends on the Anti-Deficiency Act, and they've got two problems with that. First of all, there's no violation of the Anti-Deficiency Act. It is well established that for a paid government employee to perform an additional service beyond what he or she is being paid for is not a violation of the Act. That's their theory of why there's a violation and it fails. Second of all, they're relying on the Anti-Deficiency Act to override the clear provisions of the Indian Self-Determination Act. And the Anti-Deficiency Act is a limitation only on government employees, not on private contractors who are engaged in contractual relationships with the government. Mr. Gordon, would it make a difference to either of your arguments if the BIA had posted on its website an announcement saying we are not doing any of the enumerated work, this is the only work we're doing, is work that's accepted from the shutdown, and also posted such a notice on the door of the relevant office? It would make it a more difficult case, Your Honor. How would you win if that were the case? Well, if that were the case, the argument would have to be that if notwithstanding that, Mr. Slim had accepted it, that the government had received it. Now, there would also be an issue about whether the government could, in the first place, say that the deadlines didn't apply, to say we're not here, we won't accept anything, we won't receive anything, and therefore contractors with the government are left at their peril. Well, if they said we're discontinuing our services, treat any day in which the government is shut down the same way that you would treat a weekend or a holiday. So, you could put something in the mail, but it would only be received when the officials who were responsible for that came back to work. You could not go and give something to someone who happened to be lurking around the office. So, if they were clear about that, then it's your view that the receipt probably would be defeated if it were done away. Your Honor, I would say that it's a much more difficult case. How's that different from this case? The entire country knows that the government is shut down, except for those positions that are specifically accepted. I don't know how notice really gets you very far. Everyone knows the government is shut down. The government is only partially shut down, Your Honor. It's not completely shut down. And the person who was delivering it for the Navajo Nation went to the BIA office, which was open, walked into the BIA office, met Mr. Slim, who is an ISDEA specialist, gave him the proposal, Mr. Slim accepted it. They told you right after the government came back that it's only received as of October 17th. That's after the fact. Congress has specified in the Self-Determination Act two things. And they did this as a remedial purpose because there had been a history of foot dragging before. Congress said that these proposals must be acted on within 90 days and that the only way you can extend or alter, extend or alter, this is the statutory language, that 90-day period is with the written consent of the tribe. That's in the statute itself, cited in our appendix, addendum at page 3. And in this case, when the BIA comes in, look at it from... Why didn't you all respond to the BIA and say, actually, we disagree with that and we think January 2nd will be the deadline? Because we had no obligation to do so, Your Honor. That doesn't answer the question. Well, Your Honor... People often do things they don't have an obligation to do. Your Honor, the record... Why didn't you in this case? The record does not show anything other than that the nation didn't respond. Right. And you were asked why. And you didn't answer. Because, Your Honor, I can't answer that because the record doesn't show it. And in any event, for purposes of equitable estoppel, what does the intent matter? How about for equitable tolling? It doesn't matter for the tolling either. For tolling, what would be more relevant would be when... Assuming you don't view this as a problem of the government's own creation, assuming that you would say that element is satisfied and then you're just concerned about diligence, what would be more important is when the shutdown happened. Suppose, for example, it was 90 days, as Your Honor has posited, or suppose it happened at the last... at the tail end, so that you had a situation where perhaps the person was planning to do it by the deadline and then they couldn't. That would be a more difficult case. I'll concede that would be a more difficult case. But this is a very easy case. But wouldn't it also be a more difficult case if the government shutdown went for, let's say, 80 days or 85 days or 88 days? It would, except you have to understand this. In terms of these proposals, it's very simple and it's very clear. When a tribe puts in a proposal, they are entitled to receive the same funding they got the year before. So that much has to be approved. To the extent they seek additional funding, the BIA has complete discretion to say no. And all they have to do with the stroke of a pen is say, that is declined. And this whole thing that's been suggested about, well, they wanted to encourage negotiations, is a red herring because once they partially decline, which they could do with the stroke of a pen, they could then say to the tribe, we won't give you as much as you asked for, but we might consider a lesser amount. So why don't we talk? And then if they do have such negotiations, the tribe can come back with another proposal. It could come back the next week or the next month or two months down the road with another proposal with the agreed figure. So all of the government has got a problem completely of its own creation here and is attempting to blame its failure to follow the dictates of the law on the Navajo Nation, which did nothing other than properly submit its proposal. Well, I think the theory is that the Appropriations Acts and the Anti-Deficiency Act and common sense suggests that when there's a shutdown, a lapse in appropriations, various deadlines that otherwise would be in place have to be relaxed. I mean, that's the broad theory. I'm going to quiz the government about the broader ramifications of the decision against it here. But that's the way to think about this. Well, they want an implicit override in a situation where when Ms. Quintero comes back to the office, she's lost 13 out of her 90 days, and instead of doing what Congress has mandated, which is to ask the tribe, say, look, we lost 13 days here. We'd like an additional 13 days. Will you consent to that? Rather than do that, she wrote a letter unilaterally saying we're giving ourselves a mullet. We're taking another 13 days. Didn't ask for any response from the Navajo Nation. Now, how that can be proper conduct by the agency where Congress has gone to the trouble of setting this very specific 90-day rule? How were you all harmed in this case by the additional 13 or 15 days? 13 days. Because Congress has set up a system, Your Honor. I know, but my question is were you harmed in any way by the additional 13 days in this case? Well, we're harmed if our proposal isn't deemed accepted, which is what Congress has said should happen. Other than that? What more harm should we need beyond that, Your Honor? I'm just asking is there any other harm other than that? No. Mr. Gordon, you said that they could have denied it with a stroke of a pen. It's not an onerous burden. Why is the November 7th letter on page 96 of the appendix not enough to say, at least in part, that they're denying the request, which refers to the maintenance of existing courts and program facilities and points out that that's being dealt with under the Office of Justice Services and Facilities and Maintenance. Just take that out because that's not really appropriate. What they were saying, Your Honor, was this. It cost the Navajo Nation every penny of what they sought. The government's only been covering a small fraction of it. And what that letter was really saying is you've asked for a large increase. We want you to take that request off the table. But they point to why they say it's inappropriate. I'm sorry? The letter points to why they say that's being dealt with in another bucket of money, as I understand it. It's being addressed by Office of Justice Services and Office of Facilities and Maintenance, so this shouldn't be part of a SAFA proposal, but submitted as separate. That's bureaucratic gobbledygook, Your Honor. That's why I want your help in translating. I'll ask the government also. It's basically saying you've got $1.3 million. Take your request for the additional funds off the table so that we don't have to decline. We want you to withdraw your request rather than us having to decline. And you know what? We're just not going to do anything until you see the light and take it off the table. That's what that letter says in plain English. How do you understand what it says in the preceding paragraph? Pages 1 and 2, new legislation, Tribal Law and Order Act, reflect activities beyond the current SOW and beyond the level of funding. I mean, here also they're saying, uh-uh, this, you know, we can't. As I said, the proposal sought a large increase in funding, and the BIA was entitled to say, we're not going to give you one additional dollar. So they're pointing out what is obvious, which is you're seeking a large increase, and we want you to withdraw. That is what that letter is saying. So you say that they wouldn't have been a problem if they had said, we will not fund in those two paragraphs. We will not fund anything that we think doesn't. Then it would have gone to partial declination, which is what they ultimately issued untimely in January. They could have issued the partial declination then. But once they do that, then there's no more negotiation, right? Well, there can be. That's my point, because the tribe can submit a new proposal at any time. So you can decline, thereby satisfying the 90-day deadline, and then say to the tribe, all right, now let's talk about what lesser amount we might be willing to have to provide for you. But it's very simple. But rather than do it the way that the statute requires, they unilaterally gave themselves the additional 13 days, and then they demanded what appears to be sort of a test of wills, that the nation take off the table its request. And the nation was unwilling to do that. It didn't. Forgive my lack of familiarity with the context, but the whole thing seems a little, shall we say fictional, where there is supposedly requesting and negotiating, but there's just a pot of money that's being given. And what leeway is there for getting more money or getting less money? I mean, at the end of the day, they say we only have this much money. Sorry. They can say that, Your Honor, as long as it's within 90 days. Okay. We'll give you some time for rebuttal. Thank you very much. May it please the Court. I'm John Cappell from the Appellate Staff Civil Division, U.S. Department of Justice, and I'm representing the Appellee Department of Interior on this appeal. I don't have a great deal to add to the colloquy between the Court and the plaintiffs and the district court's decision. The governor frequently comes over here and tells us that he's thoughtful to not apply against the sovereign. Isn't it a bit unseemly for you to be coming over here knowing that it applies against another sovereign and, in fact, one that's a dependent sovereign to whom the government owes a trust relationship? No, Your Honor. I don't think it's inappropriate because the estoppel government and the estoppel doctrine that originated in its recent incarnation, mostly in federal, crop, and corporate FCIC v. Merrill, and then in subsequent cases like OPM v. Richmond and Heckler and Schweiger v. Hansen, was designed and crafted by the Supreme Court for the benefit of the federal government, and it was to protect federal FISC and federal law. It did not establish any kind of freestanding or all-encompassing principle of estoppel for any sovereign entity like the state or local government or an Indian tribe. I'm not at all sure why not. When you say that, that's fine. That's an answer, but I'm not sure that I see the why behind it. Well, I would emphasize that this doctrine does not derive essentially from sovereign immunity or from sovereign status, which is what the tribe is attempting to argue. It's really to protect, again, the federal law and the federal FISC and the constitutional system in which Congress's appropriations authority is supposed to be supreme. So it's significantly about money, but is this strand exclusively about money? I would say there's the dignitary interest as well, and I do think it's a bit unseemly. The tribe points it out in the October 21st letter. There's a high-handedness about that. As you are aware, the government was on shutdown. We have 90 days after October 17th, 2013, to approve, decline, or award the proposal. The 90-day period will end on January 15th, 2014. Well, Your Honor, I wouldn't characterize that as being high-handed. I think the government was simply setting forth its understanding of the significance of the shutdown. Did you consider, and perhaps this is unfair, but I was equally unfair to the opposing counsel, did the government consider saying, this is our position, do you accept it? This letter does not ask them to respond. You are stopping them because they didn't respond, but it doesn't ask for a response. As Judge Goodhart points out, it simply declares this is the law. We're sovereign. We're declaring it. It doesn't call for a response. Why didn't you send the letter calling for a response? Well, we didn't in that first letter, but in the second letter, which was issued, the November 7th letter, which was issued after the BIA had thoroughly analyzed the tribe's proposal, it did call for a response, not specifically on the date. Not at all on the date. No. You're asking them to be stopped by silence when you didn't ask them to speak. No, it is true the government did not ask them to speak specifically on this question. Why not? Wouldn't you have a better case for Estoppel if you had asked for a response on that question? Well, it might seem more sympathetic, but under the Supreme Court's decision in Weiser v. Lawler, which the district court relied on, it's not required because there can be. Weiser was a very different situation. Weiser was a bystander. In that case, well, it was a bystander, and here you have two parties where the default rule is clear. You get to extend the time with the written consent of the other party. So it seems the burden would be on the government to obtain that written consent, no? Certainly, at least to request it, as the government did only after the deadline. In the January 9th letters, the first time I see in the record, please provide your written consent for an additional 45 days. Nothing like that within the time frame. No, there was nothing. There was no statement to that effect. But, again, I would emphasize that the ISDA really does contemplate an ongoing negotiation between the government and the tribes, and there are references throughout the statute to that, and that's the principle that the BIA was operating under here. That's fine, but there are two background clear legal duties here. One is if you don't act on it within 90 days, it's deemed granted, and the other is you don't get more time unless you seek extension. And so it would seem that, and especially given Mr. Gordon's characterization of the burden of denying, if it's up against the deadline, you could, you know, to protect the government fisc, the government should have just said, okay, we're denying this and move forward from there, no? Well, as Your Honor indicated, one could interpret the November 7th letter as a partial declination in and of itself. Although none of your briefing does that. You talk about declination later. No, but that is the, but, again, here the government was actually trying to, the BIA was actually trying to help the tribe and to work with the tribe by engaging in a back and forth. I don't doubt that, but the question is whether the timeliness duties were attended to. I also, I see in the record this contingency plan fact sheet, which sort of spells out in quite brief form on App 114 what the BIA would and wouldn't be doing in the event of a shutdown. I know most agencies will post such a notice on their website in the event of a shutdown, and I think are often required to do that. Was there any, I don't see anything in the record that there was any such notice on the BIA's website or publicly on the door or any such thing. I don't, Your Honor, I don't believe that there was anything, that there was anything on the door. However, there was, there were signs in the vicinity indicating that the, and this was the Quintero declaration makes this point, that indicated that the office was essentially closed due to the government shutdown. Is there a general rule that shutdowns cause deadlines, statutory deadlines to be, that apply against the government to be suspended, postponed? I'm worried in resolving this case in either direction, frankly, that it establishes some basic rule that's going to apply to all sorts of statutory deadlines that are out there, presumably that are affected during a shutdown. Well, there's no body of case law that actually, that establishes. Does OLC, are there OLC opinions on that question? I believe the OLC opinion, the civil levy opinion that we refer to in our brief, basically it addresses, it establishes the principle that only accepted and exempted employees can act. But that doesn't, right, I understand that part of it, but that doesn't really tell you do statutory deadlines, should they be generally relaxed, whether by an absurdity principle, by some kind of broad congressional intent, statutory interpretation mode, or some other reason that statutory deadlines should be considered relaxed during a shutdown, or delayed, suspended, whatever the term might be. I would point out that there is the, we cited the district court decision, I believe it's Herman versus International Union of Bricklayers, which relies on tolling to reach that result in a case where the shoe was on the other foot. I mean, the private party was seeking to be able to enforce its rights, and the government was saying that the time had expired during the shutdown. But that, it's clear. As far as you're aware, at least in the case law, nor in OLC, is there some general statement, a shutdown in appropriation means that statutory deadlines that are affected are delayed or postponed. I don't think that there is any specific statement to that effect. However, the principles that we've relied, the appropriations clause and the Anti-Deficiency Act. Did Mr. Slim violate the law here? No, Your Honor, Mr. Slim did not violate the law, because he could take the sort of de minimis action that he took of actually just receiving. Not officially, but informally of actually accepting. How would you distinguish what he did from receiving? If the office had been up and running, if it had been appropriated, and he had taken it and then put it in a folder or an envelope to give to the appropriate official, that certainly would have received. That's what he would have done after he received it. But how do you distinguish his receiving the document from received within the meaning of the statute? Well, he could not receive it for legal purposes, because he couldn't do anything that could conceivably bind the government contractually to accept. But that's a very strange test. I mean, neither does the employee in our clerk's office who received it have any authority to do anything that binds the government. I mean, the people who do the receiving and the stamping of receipt or the forwarding, they don't have authority to act on the papers that they're receiving, do they? No, they don't. No, they virtually never do. But there's a presumption that they're acting in the normal course of business with appropriations. Where does that presumption come from, though? Where does that presumption come from? Well, it basically comes from the structure of the Constitution and the Appropriations Clause and the Anti-Deficiency Act, which requires the- So if we're relying on the Constitution, then if the same thing happened and Mr. Duncan would go by and hand something to Mr. Slim, happened to be working on a weekend, then that would be distinguished from your rule and the weekend days would count? Because there's no constitutional bar against Mr. Slim receiving something on a weekend. No, no, there certainly isn't. The key fact is that the government was in shutdown, that there was a lack of appropriated funds. We're not arguing that- Normally, when you're using principles of estoppel, if it's not the other party's fault and it's your fault, you don't get an estoppel out of it. And here the government shutdown is not the responsibility of the Navajo Nation or any other tribe. No, but it's also- The government was the one that shut itself down. But it's not the responsibility of the executive branch either. It's the responsibility of Congress, but the executive branch is basically being held accountable for that when that was beyond its control. I think the United States is being held accountable for that, which includes the executive branch. It acts through three branches. Right now this one has to decide about what the other two did. Certainly the tribe was not responsible for the shutdown. Isn't it a bit unfair to use an estoppel against them? Your Honor, I respectfully disagree. I don't think it was unfair to, under the circumstances of this case, to use estoppel against them. The district court clearly found that on this record the tribe was acting in bad faith and it wasn't engaging in fair and honest dealing with the BIA. Suppose, just thinking of other statutory and rule deadlines, there's a government loses a case in the Court of Appeals and it has a deadline to file a petition for rehearing in bank. In the middle of that period there's a government shutdown for three days. Does that automatically extend the period for filing the petition for rehearing in bank? Well, it may if the government is not in a position to... That's the kind of question that I think could be, and there must be a thousand examples like the one I just gave, that could be affected by how we resolve this case. I'm just a little bit at sea as to what the general rule should be. We do cite a case in our brief in which the government was required to litigate an ongoing case in the district court during the shutdown because the court found that there was a need for speedy disposition. So, again, we're not saying that there may not be... But that doesn't establish any sort of principle that employees are generally accepted or accepted. On your receipt, so I'm not hugely persuaded by the estoppel argument. I'll just tell you that. But the receipt argument and the equitable tolling argument I think are strong arguments for you. But the receipt argument strikes me as opening up a can of worms because we start saying, well, we can't interpret a statutory term to mean what it otherwise says. Because of a shutdown, that principle could be used all over the place in ways that would create some confusion, I think, at least to me, whereas the tolling, I guess where I'm funneling into is the tolling argument strikes me as at least the narrowest ground in your favor that makes some sense here. Yes, Your Honor, I would agree with that characterization. We believe strongly that all three grounds are valid here and that the district court was correct on estoppel. But we certainly have argued equally vigorously for affirmance both on receipt and the relevant appropriations clause in the Anti-Deficiency Act and equitable tolling. We believe that on any of those grounds... Let me just get your reaction to this, how I'm thinking about it. The tolling would not automatically say that in a shutdown all sorts of deadlines are suspended, postponed, what have you, but would say in the facts of particular cases the courts could look at the situation and decide that the deadline properly is delayed, postponed. That is correct, Your Honor. Tolling, by its very nature, really invites that type of case-by-case inquiry and doesn't establish the broad principle it requires. It normally requires the party asserting that tolling has been pursuing its rights diligently and has been prevented from accomplishment by some extraordinary external force, doesn't it? And I'm not sure that I see that you've offered any evidence of either of those things. Well, Your Honor, again, I would respectfully disagree. The extraordinary circumstance... Your Honor, you're asking diligently when you neither asked the tribe if they agreed on the receipt question or asked for an extension of time. And what extraordinary circumstance stood in the way of the BIA acting on this request by the shorter 90-day deadline, you know, as originally calculated? There's no extraordinary circumstance standing in the way. Why don't you answer Judge Santel's question, then answer Judge Pillar's question. All three of them. Let me make sure I get them straight. Judge Santel's question, again, was... Number one, what is the evidence that you diligently pursued your rights? And number two, what is the extraordinary... Well, actually, number two and Judge Pillar are pretty much the same thing. Try to take them both straight out of me. Okay. Well, the due diligence actually is reflected in the correspondence. The one that didn't ask them for any agreement or didn't ask for any extension from... It didn't, but it made clear that the BIA was exercising its responsibilities. What it did, the first letter acknowledged receipt and basically said that the proposal would be processed. That's the base of the job of due diligence. Excuse me? That's the base of due diligence. No, Your Honor, because the second letter, the November 7th letter, actually made clear that the agency had analyzed the proposal and was doing exactly what it was supposed to do in processing a tribal proposal. But not as fast as it was supposed to do it. Excuse me? But not as soon as it was supposed to do it if the tribe is correct about the receipt date. Well, actually, it would have been as soon because it's clear that they could have and would have even done it by January 2nd if they had not been under this misapprehension that they were on the same page with the tribe. Is that clear to you that they would have done it by January 2nd? Well, yes, Your Honor. Yes, Your Honor. From this record... Right before the shutdown, they would have done that. Well, yeah. That's clear. That's essentially what the Quintero Declaration... I'll take that as your answer. Excuse me? I'll take that as your answer. It is. On this record, we believe that it is clear. Did you get Judge Pillard's question answered? I was coming to that. I believe that was on the extraordinary circumstances, and the extraordinary circumstance was it was the shutdown, the loss of the 13 days, and the government's attendant failure to process it by January 2nd. The record is clear that it would have done so if it had not been deprived of those 13 days. But the Supreme Court quite recently said that the extraordinary circumstance prong is met only where the circumstances that caused the delay are both extraordinary  and the United States government caused the shutdown. And, I mean, really, I think it would be one thing in the extraordinary circumstances claim if this were an 88-day shutdown or even an 80-day shutdown or that it happened at the back end. But it's a little harder to swallow in this circumstance where the evaluation that is needed to act on this request is not anything that's going to take anywhere near the 90 days. And the using up of time was de minimis and early. It's a little bit hard to say this is an equitable tolling situation. Well, you're on impossible. I certainly agree with that, Judge Kavanaugh. I think that we're probably beating a dead horse on this, but the extraordinary circumstance really derives from the fact that the government lost the 13 days. It's the shutdown. It really depends on whether the United States as a whole suffers the consequences of that or whether the executive branch and Congress are treated differently on that. That's correct, Your Honor. Let me ask you, how much money is at stake in this case? A lot of money, Your Honor. The difference was between less than $1.3 million and more than $17 million. So it's more than 13 times as much. It's more than $15 million difference. And we believe that whichever ground one chooses, the district court's sentiment that the tribe should not be allowed to profit in this fashion was justified. There are different ways of looking at it, but it was not. The district court clearly thought that the tribe was essentially trying to play a game of gotcha with the United States here, and it shouldn't be allowed to have that windfall. And whichever basket one chooses, if it's estoppel, official receipt, or equitable tolling, the result should be the same. The judgment should be affirmed. Okay. Thank you very much. We'll hear two minutes for rebuttal. May it please the Court. I want to address your point, Judge Kavanaugh, and say that in our view, this case is not a shutdown case. The shutdown is a sideshow. The shutdown is simply the explanation for why 13 out of the 90 days were lost. And the focus of this case is, in fact, on the 90-day provision, which Congress put in specifically to remediate an ongoing problem of the BIA and IHS not responding promptly to these tribal proposals. Tribal governments can't function if they don't know how much money they're going to get from the government. And Congress got sick and tired of the foot dragging, and it put in a very deliberate deadline. And the rule is that the proposal comes in, and if the government doesn't act, that proposal is accepted. This is not a windfall. This is not a windfall in any way, shape, or form. This is money that the Navajo Nation is already spending on its justice system. What if we knew that it wouldn't have been granted, the proposal, and we know that, if it had been submitted by June 2nd? Then why isn't it a windfall? That doesn't make it a windfall. All that is is that the BIA failed to do what it was supposed to. The BIA is completely aware of the deadline. The BIA is completely aware of the written consent requirement. The BIA didn't do its job, and now it wants to blame the Navajo Nation for that. And it stands here rather nakedly and says, please save us from ourselves and blame it on the Navajo Nation. Well, the ultimate question, I take your point on the deadlines, and I agree with that sentiment, as you expressed it, as to what Congress intended with those deadlines. What we don't know, necessarily, is how Congress intended that to mesh with the Anti-Deficiency Act in the context of government shutdown. That's what we're trying to sort out. If we didn't have the Anti-Deficiency Act, I don't think this would be as... There's no violation of the Anti-Deficiency Act here, Your Honor. Look, there are tolling... I agree with the Court that you could construct other scenarios that would make a more compelling case for equitable tolling. I suggested one myself earlier, and we're not asking for a broad rule. We're saying in the context of this case, where 13 days were lost at the start of the 90-day period, that there is no excuse for the government giving itself, saying we can give ourselves a mulligan, we can extend that unilaterally. Now, Ms. Quintero could have been on vacation, Ms. Quintero could have been sick for two weeks, any number of things could have happened, and the government wouldn't dare open its mouth and make the argument it's made here. It's trying to use the shutdown to excuse its own dereliction. Do you think it was dereliction or just a mistake? It's not like they're foot-dragging. It's that they think that they're correct on the law. It's not like others sitting around and just ignoring deadlines. Yes, but let me ask this question, though. Do we believe, does anyone in this courtroom believe for a minute that before Ms. Quintero set that October 21st letter, where she unilaterally said we've got another 13 days, that she consulted with lawyers at the BIA? Do we really think this is based on legal advice? Well, probably. Yeah, I guess I'd answer that yes. If you say it in terms of another question, it's not in the record count. You're right, Your Honor. You're absolutely right. You're going to use that jury's stuff in asserting this question. Yeah, you're right, Your Honor. I'll, but really. I mean, the idea, I guess the tone of the government's doing something nefarious here, there are lots of cases where I would agree with that tone. I don't really agree with the tone in this case.  Well, we're not suggesting it's nefarious. What I do suggest that it is, is it's much more of sort of a power struggle where the BIA has said on the November 7th, take that request off the table, and the nation basically says through its silence, no, we're not going to take it off the table. Either grant it or don't grant it. And the BIA then waits until mid-January to act. All right. Interesting and challenging case. Thank you both for the arguments. The case is submitted. Thank you.
judges: Kavanaugh, Pillard, Sentelle